## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                               )
NICHOLAS J. FIORILLO, TRACY KROWEL,  )
ROBERT DEPIETRI Jr., and                )
KIMBRLY DEPIETRI,                    )
                               )
           Plaintiffs,        )
                               )    **C.A. No.: 07-40015-FDS**
v.                            )
                               )    **C.A. No.: 07-40122-FDS**
                               )
DAVID G. MASSAD, PAMELA MASSAD,    )
MARCELLO MALLEGNI, MICHAEL NORRIS,  )
COMMERCE BANK AND TRUST COMPANY,  )
GAMEWELL REALTY, INC.,           )
LBM FINANCIAL, INC., and             )
WOLFPEN FINANCIAL, LLC,         )
                               )
          Defendants.      )
_____)

## FIRST AMENDED CONSOLIDATED COMPLAINT AND JURY DEMAND

### NATURE OF THE CASE

1.      This is an action for damages arising under the Racketeer Influence and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.  Additionally, the action includes

claims under Massachusetts law.  The predicate acts supporting the RICO counts include,

mail fraud, bank fraud, and extortion. The facts alleged also indicate violations of the Fair

Housing Act, the Truth in Lending Act, the Real Estate Settlement Procedures Act, and the

Equal Credit Opportunity Act.

2.      This RICO enterprise has been directed and controlled by defendants David G.

("Duddie") Massad and Marcello Mallegni.  Their lending companies Gamewell Realty,

Wolfpen LLC, LBM Financial LLC and Commerce Bank and Trust Company, which the Defendants have used, controlled, and directed to commit these illegal acts, are also members of the enterprise along with the other named defendants.

3.      It is alleged that all of the defendants acted in concert to defraud, extort, conspire against and deprive the Plaintiffs of monies, property and assets and have attempted to place them and their families out of their homes and in fear for their physical safety.  In addition, the defendants have tried to force settlement of other pending State and Federal claims brought against defendants David G. Massad, Pamela Massad, Marcello Mallegni, LBM Financial, Commerce Bank and Gamewell Realty, by means of extortion and threats of physical harm by attempting to strip any consideration the plaintiffs may receive from the outcome of these other pending State and Federal claims brought against some or all of the above named defendants.

4.      Defendants Massad and Mallegni through their various lending entities, including defendants Gamewell Realty, Wolfpen Financial and LBM Financial would loan money to individuals and entities and proceed to charge interest rates far in excess of the contractual amount, often in violation of Massachusetts usury laws.  This scheme was designed to effectively strip the property of its equity and force the borrowers to refinance their loans for a higher amount that would include the fraudulently-inflated interest.  The defendants used the threat of foreclosure to force the borrowers to agree to their fraudulent loan terms.  In addition, the defendants used their position to force borrowers to pay them kickbacks, whether in the form of cash or ownership interests in the various projects.

**PARTIES**

5.      Plaintiff Nicholas J. Fiorillo ("Fiorillo") is an individual who resides in Worcester, Massachusetts.

6.      Plaintiff Tracy Krowel ("Krowel") is an individual who resides in Worcester, Massachusetts.

7.      Plaintiff Robert Depietri, Jr. ("Depietri") is an individual who resides in Worcester, Massachusetts.

8.      Plaintiff Kimbrly Depietri ("Kimbrly Depietri") is an individual who resides in Worcester, Massachusetts.

9.      Defendant David G. "Duddie" Massad is an individual who resides in Westborough, Massachusetts.

10.     Defendant Marcello Mallegni is an individual who resides in Southborough, Massachusetts.

11.     Defendant Pamela Massad ("Pamela Massad") is an individual who resides in Westborough, Massachusetts.

12.     Defendant Commerce Bank and Trust Company ("Commerce Bank") is a federally insured financial institution headquartered in Worcester, Massachusetts.

13.     Defendant Gamewell Realty, Inc., ("Gamewell") is a Massachusetts corporation with its principal place of business in Northborough, Massachusetts.

14.     Defendant LBM Financial, Inc. ("LBM Financial") is a duly organized Massachusetts limited liability company with a principal place of business located in Marlboro, Massachusetts.

15.     Defendant Wolfpen Financial, LLC ("Wolfpen") is a duly organized Massachusetts

limited liability company with a principal place of business located in Marlboro,

Massachusetts.

**Facts Common to All Counts**

16.     At all relevant times, Plaintiff Fiorillo was engaged in the acquisition and development of

commercial and residential properties in the central Massachusetts area.  Fiorillo was the

husband of plaintiff Krowel and acted as her authorized agent.

17.     At all relevant times, Plaintiff Krowel was engaged in the acquisition and development of

commercial and residential properties in the central Massachusetts area.  Krowel was the

wife of plaintiff Fiorillo.  From time to time, Fiorillo and Krowel may be referred to

collectively as the Fiorillos.

18.     At all relevant times Plaintiff Depietri was engaged in the acquisition and development of

commercial and residential properties in the central Massachusetts area.  Depietri was the

husband of plaintiff Kimbrly Depietri.

19.     At all relevant times Plaintiff Kimbrly Depietri was the wife of Depietri.  From time to

time, Depietri and Kimbrly Depietri may be referred to collectively as the Depietris.

20.     At all relevant times, defendant Massad was the majority shareholder and Chairman of

Commerce Bank.  On information and belief, defendant Massad also is a major financier of,

and holds a significant ownership interest in, defendants Gamewell and LBM Financial.

21.     At all relevant times, defendant Pamela Massad was an attorney licensed to practice law

in the Commonwealth of Massachusetts.  Defendant Pamela Massad is the daughter of

defendant Massad and was an officer and Director of defendant Gamewell.

4

22.     At all relevant times, defendant Mallegni was the Manager of, and a substantial
        shareholder in, defendants LBM Financial and Wolfpen.

23.     At all relevant times, defendant Gamewell was engaged in the business of lending money
        to individuals and entities.  This money typically came from private investors and typically
        was loaned at a higher rate of interest than that provided by conventional financial
        institutions.  At no time relevant to this action, did defendant Gamewell file a Notice of
        Intent to charge usurious interest with the Massachusetts Attorney General's Office in
        connection with the Airline Lewis Loan.

24.     At all relevant times, defendant Wolfpen was engaged in the business of lending money
        to individuals and entities.  This money typically came from private investors and typically
        was loaned at a higher rate of interest than that provided by conventional financial
        institutions.   At no time relevant to this action, did defendant Wolfpen file a Notice of Intent
        to charge usurious interest with the Massachusetts Attorney General's Office in connection
        with the 219 Forest Loan.

25.     At all relevant times, defendant LBM Financial was engaged in the business of lending
        money to individuals and entities.  This money typically came from private investors and
        FDIC insured financial institutions through lines of credit and participatory loan agreements,
        and typically was loaned at a higher rate of interest than that provided by conventional
        financial institutions, usually double.  At various relevant times, defendant LBM Financial
        filed a Notice of Intent to charge usurious interest with the Massachusetts Attorney General's
        Office in connection with the 230 Maple Street Loan, the 4 North Pond Road Loan, the
        Lyman Development Trust Loan, the Erie Ave. Trust Loan, and the 219 Forest Loan.

26.    At all relevant times, Shrewsbury Street Development Corporation ("SSDC") was a corporation duly organized under the laws of the Commonwealth of Massachusetts with its corporate office located at 250 Commercial Street, Ste. 415, Worcester, Massachusetts. Plaintiff Fiorillo was the sole officer and director of SSDC.

27.    At all relevant times, 219 Forest Street LLC was a limited liability corporation, duly organized under the laws of the Commonwealth of Massachusetts, with a principal place of business in Marlborough, Massachusetts.  Plaintiff Kimbrly Depietri and David Depietri (the brother of plaintiff Robert Depietri) each initially owned 50% of 219 Forest Street LLC. After defendant Mallegni illegally gained a 40% ownership interest in 219 Forest Street LLC, Kimbrly Depietri's and David Depietri's ownership interest each was reduced to 30%.  As shareholders in a closely held corporation, Kimbrly Depietri, David Depietri and defendant Mallegni owed each other a fiduciary duty.

28.    At all relevant times, 219 Forest Street Realty Trust was a realty trust whose sole beneficiary was 219 Forest Street LLC.  Plaintiff Depietri was the authorized agent of the 219 Forest Street Realty Trust.  219 Forest Street Realty Trust and 219 Forest Street LLC will be referred to collectively as ("219 Forest").

29.    At all relevant times, 201 Forest Street LLC was a limited liability corporation, duly organized under the laws of the Commonwealth of Massachusetts, with a principal place of business in Marlborough, Massachusetts.  Plaintiff Kimbrly Depietri owned 20% of 201 Forest Street LLC.

30.    At all relevant times, 201 Forest Street Realty Trust was a realty trust whose sole beneficiary was 201 Forest Street LLC.  Plaintiff Depietri was the authorized agent of the

201 Forest Street Realty Trust.  The 201 Forest Street Realty Trust and 201 Forest Street LLC will be referred to collectively as ("201 Forest").

31.     At all relevant times, Old Centre Village Realty Trust ("Old Centre Trust") was a duly organized Massachusetts realty trust.  Plaintiff Depietri was a Trustee of the Old Centre Trust and a 50% beneficial owner.

32.     At all relevant times, Lyman Development LLC was a limited liability corporation, duly organized under the laws of the Commonwealth of Massachusetts, with a principal place of business in Marlborough, Massachusetts.  Plaintiff Depietri and his brother, David, each had a 30% ownership interest in Lyman Development LLC.   Defendant Mallegni held a 40% ownership interest in Lyman Development LLC.  As shareholders in a closely held corporation, Plaintiff Depietri, David Depietri and defendant Mallegni owed each other a fiduciary duty.

33.     At all relevant times, The Lyman Development Realty Trust, ("Lyman Development Trust") was a duly organized Massachusetts realty trust, whose sole beneficiary was Lyman Development LLC.  Plaintiff Depietri was the Trustee of the Lyman Development Trust.

34.     At all relevant times, 230 Maple Street LLC was a limited liability corporation, duly organized under the laws of the Commonwealth of Massachusetts, with a principal place of business in Marlborough, Massachusetts.  Plaintiff Depietri, his brother David, and defendant Mallegni each had a 33.33% ownership interest in 230 Maple Street LLC.  As shareholders in a closely held corporation, Plaintiff Depietri, David Depietri and defendant Mallegni owed each other a fiduciary duty.

35.    At all relevant times, 230 Maple Street Realty Trust ("230 Maple Street Trust") was a duly organized Massachusetts realty trust, whose sole beneficiary was 230 Maple Street LLC.  Plaintiff Depietri was the Trustee of the 230 Maple Street Trust.

36.    At all relevant times, the Erie Ave. Residential Realty Trust ("Erie Ave. Trust") was a duly organized Massachusetts realty trust.  Depietri was the Trustee of the Erie Ave. Trust. The beneficial owners of the Erie Ave. Trust were Depietri (50%) and Fiorillo (50%).

37.    At all relevant times, 65 Boston Post Road Realty Trust ("Boston Post Road Trust") was a duly organized Massachusetts realty trust, whose sole beneficiary was 65 BPW LLC. Depietri was the Trustee of the 65 Boston Post Road Trust.  At all relevant times, the Boston Post Road Trust owned a commercial office building located at 65 Boston Post Road West.

38.    At all relevant times, 65 BPW LLC was a limited liability corporation, duly organized under the laws of the Commonwealth of Massachusetts, with a principal place of business in Marlborough, Massachusetts.  The owners of 65 BPW LLC were: Plaintiff Kimbrly Depietri (13.33%), David Depietri (13.33%) Louise Depietri (13.33%), Vision Holding Corporation (10%) and Colonial Capital Corporation (50%).

39.    On or about November 1, 2000, defendant Norris entered into a 10 year lease agreement with the Boston Post Road Trust to lease office space in 65 Boston Post Road West building. Under the terms of the 10 year lease, Norris was required to make payments totaling approximately $544,000 to the Boston Post Road Trust.

40.    On or about May 25, 2004, the Federal Deposit Insurance Corporation and the Massachusetts Division of Banks served Commerce Bank with an Order to Cease and Desist, based upon the bank's unsafe and unsound lending practices.

8

41.     At all relevant times, usury was the practice of charging an excessively high rate of interest on money loaned.   Under Massachusetts General Laws § c. 271 §49 a loan was usurious if it was in excess of 20% per annum, inclusive of all fees and penalties.

42.     At all relevant times, pursuant to Massachusetts General Laws c. 271 §49, an individual or entity could lend money at a usurious rate if it notified the Attorney General of its intent to engage in such a transaction.

### The Airline Lewis Building Loan

43.     In or around June, 2002, Fiorillo sought to acquire a commercial property located at 267 Shrewsbury Street, Worcester, Massachusetts consisting of approximately 12,000 square feet of commercial space formerly occupied by a window blind manufacturing company known as the "Airline Lewis Company" (the "Airline Lewis Building").  The purchase price of the Airline Lewis Building was $398,000.  Fiorillo made a deposit on the property of $38,000.

44.     In order to acquire the Airline Lewis Building, Fiorillo approached defendant Massad, who, at that time, was a family friend, employer and previous financial backer of Fiorillo, to finance the balance of the $398,000 purchase price.

45.     In his various discussions with defendant Massad, Fiorillo was led to believe that the acquisition financing would be provided through defendant Commerce Bank at a conventional rate.

46.     On or about September 13, 2002, Fiorillo arrived at the offices of Fletcher, Tilton & Whipple in Worcester, Massachusetts for the closing of the Airline Lewis Loan.

47.     At that time, Fiorillo first learned that the loan terms were not conventional and, in fact, that the loan was being made not by defendant Commerce Bank but by defendant Gamewell.

9

Defendant Pamela Massad presented Fiorillo with a Loan Agreement for a $575,000 loan. Under the terms of the loan agreement, only $363,000 was to be advanced to Fiorillo to pay for the property. The remaining $212,000 was "additional interest." Defendant Pamela Massad also presented Fiorillo with a Demand Note in the amount of $575,000 at an above-market interest rate of 15%.

48.    Fiorillo protested to defendant Pamela Massad that these were not the loan terms on which he and defendant Massad had agreed. Defendant Pamela Massad replied that her father had changed the deal and he could take it or leave it. Fiorillo then called defendant Massad who told him to sign the deal with defendant Gamewell and they would address his concerns later. Defendant Massad further stated to Fiorillo that the $212,000 could be used as an interest reserve from which the monthly interest payments on the advanced funds could be made. Defendant Massad concluded the conversation by telling Fiorillo, "Son, you can trust me." Fiorillo, fearing the loss of his deposit and relying on the representations of defendant Massad agreed to proceed with the loan.

49.    On or about September 13, 2002, Fiorillo and defendant Gamewell entered into a loan agreement for $575,000 secured by a mortgage on the Airline Lewis property. The loan agreement was signed by Fiorillo and defendant Pamela Massad, as Vice-President of Gamewell.

50.    On or about February 26, 2003, Fiorillo received an offer of $600,000 to purchase the Airline Lewis property. Fiorillo contacted defendant Massad for a payoff figure for the Airline Lewis loan. Defendant Massad fraudulently stated to Fiorillo that the payoff amount on the loan was $630,000, which represented an effective interest rate of over 70% on the

funds actually advanced.  Defendant Massad steadfastly refused to recalculate the payoff amount at the non-usurious rate of interest set forth on the Note and Fiorillo lost the sale.

51.    On or about December 12, 2003, Fiorillo received an offer of $800,000 to purchase the Airline Lewis property.  Fiorillo again contacted defendant Massad for a payoff figure for the Airline Lewis loan.  Defendant Massad fraudulently stated to Fiorillo that the payoff amount on the loan was $860,000, which represented an effective interest rate of over 40% of the total amount of the Note and over 100% on the funds actually advanced.  Defendant Massad steadfastly refused to recalculate the payoff amount at the non-usurious, contract rate of 15% and Fiorillo lost the sale.

52.    On or about September 10, 2004, Fiorillo received an offer of $760,000 to purchase the Airline Lewis property.  Fiorillo yet again contacted defendant Massad for a payoff figure for the Airline Lewis loan.  Defendant Massad fraudulently stated to Fiorillo that the payoff amount on the loan was $ 850,000, which represented an effective interest rate of over 70% on the funds actually advanced.  Defendant Massad steadfastly refused to recalculate the payoff amount at the non-usurious, contract interest rate of 15% and Fiorillo lost the sale.

53.    In or around the fall of 2005, at the instruction of defendant Massad, defendant Mallegni asked Depietri to assist Fiorillo in his efforts to develop the Airline Lewis Building. Defendant Mallegni informed Depietri that if he assisted Fiorillo, defendant LBM Financial would provide financing for the project and pay off defendant Gamewell.

54.    Depietri began to assist Fiorillo in his efforts to resolve the dispute he had with defendant Massad and develop a use for the Airline Lewis Building. Within a very short time frame they had made arrangements with a national fitness center to become a potential tenant. Based upon these arrangements, Depietri and Fiorillo contracted various architects and

11

engineers including Universal Architects of Holliston, MA and CFS Engineering of Worcester to design a facility around the tenant needs. In addition, Depietri and Fiorillo entered into negotiations with adjacent landowners to secure additional parking for the proposed fitness center.

55.    In or around February, 2006, after Depietri and Fiorillo had spent tens of thousands of dollars and hundreds of hours of time and received a proposed closing date and term sheet from defendant LBM Financial, defendant Mallegni informed Depietri and Fiorillo that defendant Massad did not want defendant LBM Financial to lend money to Depietri and Fiorillo to develop the property.

56.    Defendant Mallegni further informed Depietri that if he wanted to have a prosperous and continued relationship with defendants LBM Financial and Commerce Bank, he would have to back out of Fiorillo's development efforts immediately and distance himself from Fiorillo both financially and otherwise.

57.    In or around the second week in February 2006 a meeting took place at the offices of LBM Financial which was attended by Fiorillo, Depietri, defendants Massad and Mallegni, an associate of defendant Massad from Rhode Island ("Massad's Rhode Island associate") and defendant Norris.   During the course of this meeting, defendants Massad and Mallegni and defendant Massad's Rhode Island associate demanded that Fiorillo deed the Airline Lewis Building over to defendant Massad and to pay immediately all outstanding monies owed to defendant Gamewell.   Defendants Massad and Mallegni further threatened to foreclose Fiorillo's other outstanding loans with their various other lending companies, including defendant Commerce Bank's loan on Fiorillo's family home located at 425B Salisbury Street, Worcester.   Defendant Massad and his Rhode Island associate also made

12

numerous physical threats to Fiorillo to induce him to deed over the Airline Lewis Property. Specifically, defendant Massad told Fiorillo, "If this was twenty years ago, you'd be dead kid.  Now sign the fucking deed!"

58.   On or about May 3, 2006, defendant Pamela Massad, as Clerk of defendant Gamewell mailed an Acceleration and Demand letter to Fiorillo.  In this letter, defendant Pamela Massad demanded the immediate payment to defendant Gamewell of $931,216.69. This usurious, fraudulently inflated "Demand Amount" included not only an alleged "principal balance" of $593,092 (which included the $212,000 of "pre-paid interest" but also an additional $325,329.00 in interest and $12,795.69 in "unpaid late charges."  This resulted in an effective annual interest rate of 47% on the amount actually loaned to Fiorillo.

## The 219 Forest Street Loan

59.   On or about August 5, 1998, defendant Wolfpen loaned 219 Forest $1,200,000 to purchase a 26 acre parcel of land located at 219 Forest Street in Marlborough, Massachusetts. To secure the loan, the 219 Forest gave defendant Wolfpen a Note that required interest-only payments at the stated interest rate of 15% per annum and a first priority Mortgage on the Property (the "August Loan").   Defendant Mallegni signed the loan documents on behalf of defendant Wolfpen.   Depietri loaned 219 Forest $200,000 of personal funds to be used as a down payment on the property.

60.   In or around September 1999, after the August Loan had matured, defendant Mallegni arranged for Hudson Savings Bank to loan to 219 Forest $650,000 (the "Hudson Note"). Defendant Wolfpen was paid all of the proceeds of the Hudson Note, but defendant Mallegni, nevertheless demanded that 219 Forest execute a separate Note secured by a second mortgage on the property, to defendant Wolfpen in the amount of $734,688 (the "Wolfpen

13

Note"), which defendant Mallegni alleged to be the remaining balance on the August Loan.

Depietri informed defendant Mallegni that the claimed balance included   a usurious amount

of interest and, therefore, he objected to providing the Wolfpen Note.  Specifically, defendant

Mallegni's calculation of the interest amounted to a usurious rate of approximately 32%.

Defendant Mallegni threatened to foreclose on the Property if 219 Forest refused to sign the

Wolfpen Note.  Faced with this threat, 219 Depietri acceded to defendant Mallegni's demand

and 219 Forest signed the Wolfpen Note and second mortgage.

61.     As a result of Mallegni's demand for the usurious and fraudulently inflated interest

payment, 219 Forest lost over $153,000 in overpaid interest to defendant Wolfpen.

62.     In or around March 2001, when the Hudson and Wolfpen Notes had matured, defendants

Mallegni and Massad arranged a $1,800,000 loan from defendant Commerce Bank to 219

Forest.  Depietri intended that 219 Forest would use the proceeds to pay the Hudson Note in

full as well as what he believed to be the outstanding balance on the Wolfpen Note of

$670,779.  Defendant Mallegni, however, fraudulently claimed that defendant Wolfpen was

owed actually owed $907,517.

63.     On or about March 20, 2001, at the closing on the Commerce Note, defendant Mallegni

demanded, for the first time, that 219 Forest execute a $236,738 interest-only note to

defendant LBM Financial at a rate of 16% (the "March Note").  The March Note represented

the difference between what defendant Mallegni fraudulently claimed defendant Wolfpen

was owed under the Wolfpen Note and the actual, outstanding balance of the Note.  In effect,

defendant Mallegni was seeking to collect interest on the excessive interest defendant

Wolfpen already had overcharged fraudulently to 219 Forest.  Defendant Mallegni threatened

that unless the 219 Forest signed the March Note and granted defendant LBM a second

14

mortgage, defendant Commerce Bank would not close on its loan and defendant Mallegni would foreclose on the Wolfpen Note.

64. As a further condition on the loan, defendant Massad required that defendant LBM Financial sign a repurchase agreement, whereby defendant LBM Financial would buy back to loan if defendant Commerce Bank was not paid off. At the closing defendant Mallegni demanded a 40% personal ownership interest in 219 Forest as a condition to signing the repurchase agreement. Defendant Mallegni also demanded that Depietri and his brother assign to defendant LBM Financial their right to receive $202,271 in reimbursements from an unrelated development project of theirs. Defendant Mallegni told Depietri that the $202,271 would be applied to the balance to the March Note. Again, faced with a threat of foreclosure from defendant Mallegni, 219 Forest executed the March Note and granted defendant Mallegni a 40% interest in 219 Forest. The loan from defendant Commerce Bank was then allowed to close.

65. From on or about March 20, 2001 through in or around June 2002, Depietri personally paid $202,271 to LBM Financial, ostensibly to pay down the March Note. By June 2002, according to defendant LBM's own internal accounting records, the March Note had been paid down to $112,000.

66. In or around the fall of 2001, Depietri began to seek takeout and construction loans to develop the 219 Forest Street project.

67. By in or around March 2002, Depietri received a commitment from First Essex Bank for approximately $7,000,000 to pay off the Commerce Note and the March Notes before they came due and to provide construction financing to develop the property.

68.     At the direction of defendant Massad, defendant Mallegni, as a 40% owner of 219 Forest,

refused to agree to the First Essex Bank proposal and instead directed Depietri to obtain the

takeout and construction loan from defendant Commerce Bank.  Defendant Mallegni

threatened Depietri that he did not refinance the loan with Commerce Bank, defendant LBM

would foreclose on March Note and otherwise interfere with other projects in which Depietri

had an interest.  Relying on the representations of defendants Mallegni and Massad, 219

Forest allowed the First Essex loan commitment to lapse and the Commerce Note and the

March Note matured and came due.

69.     In or around June 2002, after initially agreeing to match the terms of the First Essex loan

proposal, defendant Massad caused defendant Commerce Bank to withdraw its loan

commitment and instead offer 219 Forest a $5 million financing package, which was

$2 million less than the First Essex commitment.  When Depietri informed defendant Massad

that the new loan proposal did not contain enough money to finance the construction of the

project, defendant Massad caused defendant Commerce Bank to claim that the Commerce

Note had matured, and threatened immediate foreclosure.

70.     In or around December 2002, with 219 Forest facing the threat of foreclosure by

defendant Commerce Bank, defendant Mallegni, pursuant to the repurchase agreement with

defendant Commerce Bank, caused defendant LBM Financial to loan 219 Forest $1,733,632,

ostensibly to enable 219 Forest to pay off the Commerce Note.  On information and belief,

these funds came from various investors, including defendants Massad, Mallegni and

Commerce Bank.

71.     On or about December 31, 2002, 219 Forest and defendant Mallegni executed a note in

the amount of $1,733,632 (the "December Note") payable to defendant LBM Financial.  The

16

December Note was for a term of one year, and called for interest-only payments at a rate of 14% per annum.  The December Note was secured by a first mortgage on the 219 Forest Street Property.  In addition, immediately prior to the closing, defendant Mallegni demanded additional collateral.  Specifically, defendant Mallegni threatened not to close the loan and to allow defendant Commerce Bank to foreclose on its note unless defendant LBM received a guaranty from 201 Forest, secured by a mortgage on property it owned, located at 201 Forest Street in Marlborough, Massachusetts.  The March Note in favor of defendant LBM Financial and secured by a second mortgage on the 219 Forest Street property would remain in place.  Depietri, in fear of foreclosure and having already invested over $1 million in the project with 219 Forest, agreed to defendant Mallegni's demands.

72.	On or about December 31, 2002, 219 Forest paid off the Commerce Note.

73.	On or about December 19, 2003, defendant Mallegni, agreed to extend the December Note at the same interest rate, provided that 219 Forest pay one point.

74.	In or around January 2004, defendant Mallegni instructed defendant Norris to break his lease with the Boston Post Road Trust and move into an office building owned by defendant Mallegni.

75.	On or about January 28, 2004, defendants Mallegni and LBM Financial wrote to 219 Forest and demanded additional concessions in order to extend the December Note, including a payment of an additional three points, and a release of defendant Norris from his lease obligations with the Boston Post Road Trust.  If these demands were not met, defendant Mallegni informed Depietri that defendant LBM Financial would refuse to extend the December Note and would declare a default.

17

76.     On or about January 30, 2004, defendant Norris sent a letter to Depietri which stated that

defendant Mallegni would sign the extension to the December Note after Depietri agreed to

release Norris from his lease with the Boston Post Road Trust.

77.     In or around March 2004, although Depietri had not released attorney Norris from his

lease obligations, Norris breached his lease and moved into office space owned by defendant

Mallegni.  At the time Norris breached the lease, he owed the Boston Post Road Trust

approximately $385,000 under the terms of the balance of the lease.

78.     In or around March of 2004, defendants Mallegni and LBM Financial began assessing the

December Note at a purported "default rate" of 20% plus interest plus 1 point per month,

compounded daily, an effective rate of interest of approximately 34% annually.  Defendants

LBM Financial and Mallegni, however, took no further action to enforce the December Note

at that time and continued to accept the previously agreed upon 14% interest payments from

219 Forest.

79.     By in or around November 2005, Depietri had had obtained financing commitments that

would enable 219 Forest to pay off defendant LBM Financial and to fund construction of

office condominiums on the property.  Depietri also had obtained approximately $5,000,000

of pre-sales of the condominiums.

80.     On or about November 16, 2005, in order to close the new financing, Depietri requested

confirmation of the payoff amount for the March and December Notes from defendants

Mallegni and LBM Financial.

81.     On or about November 30, 2005, defendant Mallegni informed Depietri that 219 Forest

owed LBM approximately $3,500,000 in principal, interest and fees on the two loans.  This

amount exceeded the amount actually due on the March and December Notes by

18

approximately $1.3 million.  In his calculation, defendant Mallegni had not applied any of the payments made by Depietri to the March Note and sought the entire principal amount of $236,738 plus a usurious amount of interest.

82.     From on or about December 13, 2005 through in or around February 2006, Depietri repeatedly requested that defendant Mallegni provide a corrected payoff figure for the March and December Notes so that 219 Forest could obtain financing and honor its $5,000,000 in pre-sales of offices and condominiums.

83.     From in or around November 2005 through in or around February 2006, defendant Mallegni refused to provide an accurate payoff amount, for the March and December Notes and, as a consequence, 219 Forest lost its lending commitment and the pre-sales.

84.     Unbeknownst either to Depietri or 219 Forest, on or about November 20, 2005, defendant Mallegni caused LBM Financial to pledge the December Notes and mortgages on 219 Forest and 201 Forest to DanversBank as collateral for an obligation of LBM Financial relating to property in Manchester, New Hampshire in which defendants Mallegni and Massad held an interest.  Defendant Mallegni did not have the authority from the other investors to pledge the December Note to DanversBank.  Moreover, defendant Mallegni did not inform DanversBank that: 1) he did not have the authority to pledge the December Note as collateral; and 2) he previously had sold positions in the December Note through separate loan participation agreements to other investors, including defendants Massad and Mallegni. As a consequence of defendant Mallegni's fraud upon DanversBank and LBM Financial's own investors, defendant Mallegni could not allow the December Note to be paid off and 219 lost its ability to refinance the project and escape defendant LBM's usurious and fraudulently calculated interest charges.

85.     On or about February 1, 2007, DanversBank assigned the December Note and Mortgages

back to defendant LBM Financial in exchange for a second mortgage on 171 Locke Drive,

Marlborough, Massachusetts, a building owned by defendant Mallegni.

86.     On or about February 20, 2007, defendant LBM Financial caused demand notices to be

mailed to the trustees of 219 Forest and 201 Forest demanding the full and immediate

repayment of the March and December notes, including approximately $3 million in

fraudulently inflated interest charges.

87.     On or about April 18, 2007, defendants LBM and Mallegni caused a Notice of Intent to

Foreclose to be mailed to the Trustees of 219 Forest and 201 Forest based on the refusal of

219 Forest to pay the fraudulently inflated loan amounts sought by defendants LBM

Financial and Mallegni.

88.     From in or around November 2005 through in or around May 2007, defendants Mallegni

and LBM Financial refused numerous requests to provide an accurate, non-usurious payoff

amount for the December and March Notes.  As a result, between November 2005 and may

2007, 219 Forest has lost at least two other financing commitments that would have enabled

it to pay off defendant LBM Financial and develop the property.

89.     On or about May 9, 2007, and June 19, 2007, each of 219 Forest Street, LLC and 201

Forest Street, LLC, respectively, filed voluntary petitions for relief under the United States

Bankruptcy Code initiating bankruptcy proceedings.

90.     On May 25, 2007, LBM filed a proof of claim in the United States Bankruptcy Court,

seeking to recover $5,003,243.28 on the March and December notes.  Included in this proof

of claim is the full, original amount of interest on the March note, despite the fact that

defendant LBM Financial's own internal accounting records stats that the principal amount

of the loan was paid down to $112,000 by June 2002.

91.     As a result of activities of defendants Mallegni, Massad, Wolfpen and LBM Financial,

219 Forest paid over $396,000 in usurious and fraudulently inflated interest payments and

lost the ability to develop and profit from the 219 Forest project.

## 249 Lincoln Street Loan

92.     In or around April 2005, Fiorillo and Krowel approached defendants Mallegni and LBM

Financial about obtaining a $550,000 loan to purchase a commercial property located at 249

Lincoln Street, Worcester, Massachusetts.

93.     On or about April 28, 2005, Krowel signed a loan commitment with defendant Mallegni,

whereby defendant LBM Financial would loan Krowel $550,000 at an interest rate of 14%

and payment of 3 points.  Fiorillo signed the loan commitment as a Guarantor.

94.     On or about May 3, 2005, Fiorillo and Krowel attended the loan closing at the office of

defendant Norris, who represented defendants LBM Financial and Mallegni.  At the closing,

defendant Norris informed Fiorillo and Krowel that defendant Mallegni had unilaterally

changed the terms of the loan to 16% interest and the payment of five points.  Norris further

informed Fiorillo and Krowel that if they did not immediately assign a 25% ownership

interest in a building that they owned on 157 Shrewsbury Street, Worcester to defendant

Mallegni personally, defendant LBM Financial would not close the loan.  This would result

in Fiorillo and Krowel losing $20,000 in deposits and soft money already invested in the 249

Lincoln Street property, in addition to other damages, including a lawsuit for non-

performance by the seller.

95.     On or about May 3, 2005, Fiorillo and Krowel signed the loan closing documents with

defendant LBM Financial for a $550,000 loan secured by a mortgage on 249 Lincoln Street.

96.     On or about May 3, 2005 Fiorillo and Krowel granted defendant Mallegni a 25%

ownership interest in their building located at 157 Shrewsbury Street.  Under the terms of the

agreement, defendant Mallegni, although a 25% owner of the property, would not be

responsible for any costs or expenses associated with the property.

97.     By on or about November 10, 2005, Fiorillo and Krowel had secured a loan to refinance

249 Lincoln Street and contacted defendant LBM Financial to request a payoff figure.

98.     On or about November 16, 2005, defendant Norris, on behalf of defendant LBM

Financial, mailed Fiorillo and Krowel a notice of default and demand for the immediate

payment of $648,758.48, which represented a fraudulently inflated interest rate that was well

in excess of that set forth on the Note.

99.     Thereafter, Fiorillo repeatedly requested an accurate payoff amount at the actual contract

rate in order to secure refinancing on the property but defendants LBM and Mallegni and

attorney Norris steadfastly refused.

100.    Because of the refusal of defendants LBM Financial and Mallegni, to provide an

accurate pay-off figure for the loan, Fiorillo and Krowel lost their financing and the loan

went into foreclosure.

101.    In or around May 2006, defendants Mallegni and LBM Financial caused a notice

of foreclosure to be mailed to Fiorillo and Krowel which claimed that they owed

approximately $783,000 on the 249 Lincoln Street Note.  This amount represented a

fraudulently inflated interest rate that was more than double that which was set forth in the

Note.

## The Chase Building Loan

102.   In or around the Spring of 2000, Chase Building Associates II Limited Partnership

("CBA") sought to refinance its mortgage on a commercial property located at 44 Front

Street, Worcester, Massachusetts, known as the Chase Building.  The first mortgage was held

by Wainwright Bank and trust and the second mortgage was held by defendant LBM

Financial.  Defendant Mallegni suggested to Depietri that the approach defendant Massad

and defendant Commerce Bank for the refinancing.

103.   In or around September 2000, Commerce Bank issued a loan commitment for the project

of $3 million.  Under the terms of the loan commitment, Depietri would guaranty the loan.

104.   On or about September 20, 2000, defendant Mallegni informed Depietri that in order to

close on the loan, defendant Massad would that CBA pay a "consultant's fee" to two

associates of defendant Massad ("Massad's Worcester Associates").  Neither Depietri, nor

anyone affiliated with CBA utilized Massad's Worcester Associates as consultants in

connection with obtaining the refinancing from defendant Commerce Bank.

105.   On or about September 20, 2000, the CBA loan closed.  The HUD-1 Settlement

Statement prepared by defendant Pamela Massad noted a $30,000 payment from the loan

proceeds to pay a "broker's fee," although no broker was involved in the transaction.  Upon

information and belief, that $30,000 was paid to defendant Massad and his Worcester

Associates.

106.   On or about August 28, 2003, defendant Commerce Bank rewrote the CBA loan and

lowered the interest rate from 8.5% to 7.5%.  Under the terms of the loan rewrite, all rents

collected from the Chase Building went into a "lock box" account at defendant Commerce

Bank and the mortgage payment was deducted directly from that account.

## Old Centre Village Realty Trust Loan

107.

108.    On or about April 28, 2000 LBM Financial loaned $119,000 to the Old Centre Village

Trust to acquire Lot 1A Pleasant Street in Framingham, MA, a vacant residential lot (the

acquisition loan"). Defendant Mallegni required Depietri to sign a personal guaranty for the

acquisition loan.

109.    By in or around July, 2001 the Old Centre Village Trust had secured permits to construct

a single family home on the property and sought a $ 320,000 loan from LBM to refinance the

acquisition loan and for construction funds.

110.    On or about July 11, 2001, Depietri attended the closing of the Old Centre Village

construction loan at the office of defendant LBM Financial's attorney, Michael Norris.  In

reviewing the settlement statement, Depietri noticed that defendant LBM Financial claimed

that the payoff amount for the $119,000 acquisition loan was $230,903.11, which represented

an effective interest rate of 75%.  Depietri questioned attorney Norris about the inflated the

inflated payoff amount and was told that the payoff "is what it is" and if Old Centre Village

wanted the construction loan to go through then Depietri had to sign the loan papers.  Norris

further informed Depietri that defendant Mallegni was using the excess interest payments

from the Old Centre Village Realty Loan to pay off a loan of another one of LBM Financial's

borrowers who had defaulted on an unrelated land loan in Bolton, MA.   Rather than lose the

entire project, Depietri signed the construction loan documents, which resulted in Old Centre

Village making an overpayment to LBM Financial of $63,183.93.

111.    On or about June 4, 2002, following the sale of the house, Depietri contacted defendant

LBM Financial to obtain the payoff amount on the construction loan.

112.     On or about June 4, 2002, defendant Norris, on behalf of defendant LBM Financial

informed Depietri that the payoff amount was approximately $507,000.00.  This amount

represented an effective interest rate of 24% and was $17,609 greater than the amount due to

defendant LBM Financial under the terms of the loan.  Depietri questioned attorney Norris

about this figure.  Attorney Norris admitted that the repayment amount was overstated, but

refused to provide a correct payoff amount.

113.     On or about June 4, 2002, Old Centre Village Trust paid the fraudulently inflated loan

amount that defendant LBM Financial claimed it was owed on the construction loan.  In

total, Old Centre Village Trust paid defendant LBM Financial over $94,000 in fraudulent and

usurious interest charges.

**Lyman Development Loan**

114.     In or around August 2001, Lyman Development sought to acquire and develop a

commercial property located on 44 Lyman Street, Northborough, Massachusetts ("the Lyman

Street property").

115.     On or about August 16, 2001 Lyman Development Realty closed on a construction loan

from defendant LBM Financial in the amount of $368,841.83.  The loan was secured by a

second mortgage on the Lyman Street property.  The loan documents were signed by

Depietri and defendant Mallegni.

116.     Between August 16, 2001 and August 22, 2002, Lyman Development made a series of

draws on the construction loan.

117.     In or around July 2002, Lyman Development was sued by a prospective tenant of the

property, S&M Movers, to recover a $66,000 security deposit from the Trust ("the S&M

25

Lawsuit").  Attorney Roy Bourgeois represented the plaintiffs S&M against Lyman Development.

118.    By on or about August 22, 2002, the entire amount of the loan proceeds had been advanced to Lyman Development and the building had been completed.

119.    In or around the fall of 2002, Lyman Development sought to pay off defendant LBM's loan through a refinance of the property through a conventional mortgage.

120.    In or around the fall of 2002, Depietri, on behalf of Lyman Development requested a loan payoff figure from defendant LBM Financial.

121.    Defendants LBM Financial and Mallegni refused to provide a loan payoff figure until shortly before the closing on the refinance loan, which was scheduled for October 1, 2002.

122.    On or about October 1, 2002, defendant LBM Financial presented Lyman Development with a loan payoff figure that included $164,321.97 in fraudulently inflated interest payments.  This represented an interest rate of slightly over 40%, and was approximately $48,100.00 in excess of the maximum amount of interest allowable under the loan documents.

123.    Depietri protested the fraudulent payoff amount to defendant Norris, who represented defendant LBM Financial.  Norris refused to permit any changes to the payoff figure.

124.    Faced with the possible loss of the refinancing if it failed to meet the demands of defendant LBM Financial, Lyman Development paid the fraudulently inflated loan amount that defendant LBM Financial claimed it was owed on the construction loan.

125.    In or around December 2002, the Lyman Street property was sold.  Depietri, personally, received no money from the sale.

126.    In or around January 2006, the S&M Lawsuit went to trial and Lyman Development was
        found liable to repay S&M its security deposit plus interest.  None of the beneficiaries of
        Lyman Development were held personally liable, including Depietri.

### The 230 Maple Street Loan

127.    In or around August 2001, the 230 Maple Street Trust sought to acquire a commercial
        property located at 230 Maple Street, Marlborough, MA ("the 230 Maple Street property").

128.    Defendant Mallegni arranged for a $900,000 loan from Milford National Bank and an
        additional $200,000 loan from defendant LBM Financial, secured by a second mortgage on
        the 230 Maple Street property.

129.    On or about August 24, 2001, the 230 Maple Street Trust closed on the $200,000 second
        mortgage loan from defendant LBM Financial.  At the time of the closing, the 230 Maple
        Street Trust pre-paid defendant LBM Financial $23,435.79 in interest.

130.    In or around February 2004, the 230 Maple Street Trust requested a loan payoff figure
        from defendant LBM Financial in anticipation of a pending sale of the property.

131.    In or around February 2004, defendant LBM Financial provided the 203 Maple Street
        Trust with a payoff figure $379,914.88, which included over $178,000 in fraudulently
        inflated interest charges that were assessed in addition to the $23,435.79 in interest paid by
        230 Maple Street at the closing.  This fraudulently inflated interest amount sought by
        defendant LBM Financial represented an effective annual interest rate of approximately 40%,
        and exceeded the maximum amount of interest chargeable under the terms of the loan by
        approximately $76,000.

132.    Depietri protested this fraudulently high repayment to defendant Mallegni and defendant
        Norris.  Eventually, defendant Mallegni agreed to reduce the amount of interest due on the

LBM Loan to by $50,668.72, which, nonetheless left the amount of interest due on the note, fraudulently inflated by over $127,000 and represented an effective annual interest on the loan of approximately 32%.

133.    On or about March 4, 2004 the 203 Maple Avenue property was sold to Bluefin Properties, LLC for $1.37 million. At the loan closing, defendant LBM Financial released is mortgage on the property.

134.    From on or about March 5, 2004 through on or about April 5, 2005, defendant LBM Financial began billing the 230 Maple Street Trust for the $50,668.72 in fraudulent unpaid interest charges that it had agreed to deduct from the payoff amount, despite having released its mortgage on the 230 Maple Street property.

135.    From on or about March 5, 2004 through on or about April 5, 2005, defendants LBM Financial and Mallegni, acting through defendant Norris, attempted to collect the $50,668.72 in fraudulent unpaid interest charges from Depietri by threatening to delay or withhold financing and re-financing of various Depietri-related projects by defendant LBM Financial.

136.    On or about March 31, 2004, attorney Norris, on behalf of defendants LBM Financial and Mallegni, sent a letter to Depietri that fraudulently sought to condition the extension of loans from LBM Financial to 219 Forest on the payment to defendant Mallegni of $22,000 of the $50,668.72 in fraudulent unpaid interest charges.

### Evergrass Loan – Depietri Family Home

137.    In or around April 2005, Evergrass, Inc. ("Evergrass"), a company owned by Depietri, sought a $200,000 business loan from defendant LBM Financial.  Under the terms of the loan agreed to by Depietri and defendant Mallegni, the loan would be secured by the plant,

fixtures, receivables and equipment of Evergrass.  Robert and Kimbrly Depietri also were required to sign a personal guaranty on the loan.

138.    On or about April 19, 2005, at the closing of this loan, defendant Norris, who was representing both defendant LBM Financial and Kimbrly Depietri demanded, for the first time, that the Depietri's personal guaranty on the Evergrass loan be secured by a second mortgage on their family home located at 4 North Pond Road, Worcester, Massachusetts. When Kimbrly Depietri was presented with the 2nd mortgage, she immediately protested and demanded to speak with defendant Mallegni.  She was assured by defendant Norris that "nothing would happen to your house" and that the deal was structured that way only to "make the investors happy."  Relying, in part, upon the assurances of defendant Norris, and wanting to close the Evergrass loan as soon as possible, the Depietris executed a guaranty secured by a second mortgage on their family home located at 4 North Pond Road, Worcester, Massachusetts.

139.    On or about April 21, 2005, attorney Michael Norris, acting at the direction of defendant Mallegni, wrote an unauthorized check out of the loan proceeds in the amount of $23,334.36, made payable to defendant Mallegni, personally.

140.    As of April 21, 2005, neither Evergrass nor the Depietris owed $23,334.36 to defendant Mallegni personally, nor did they authorize its payment either to defendant Mallegni, or to defendant LBM Financial, from the loan proceeds.  Despite writing this check from the loan proceeds, attorney Norris prepared a HUD-1 Settlement Statement that failed disclose this $23,334.36 payment to defendant Mallegni.  Defendant Mallegni signed this fraudulent HUD-1.

141.    On or about April 21, 2005, attorney Norris mailed a copy of the fraudulent HUD-1
    Settlement statement to Depietri.

142.    On or about August 29, 2005, Evergrass refinanced its loan with defendant LBM
    Financial and obtained a $300,000 loan.  When the Depietris were presented with the second
    mortgage documentation, they immediately confronted Norris about the agreement to remove
    the second mortgage on their home.  Attorney Norris replied, "I talked with Marcello and he
    did not want to remove it.  If you do not resign the new one, I have explicit orders to
    commence immediate foreclosure on the original note."  Faced with this threat of foreclosure
    on their home, the Depietris for the second time executed a guaranty for the loan secured by a
    second mortgage on their family home.

143.    From on or about August 29, 2005, through on or about June 30, 2006, defendant LBM
    Financial fraudulently assessed interest payments on the Evergrass loan at a rate of
    approximately 42%, which was 28% higher than the stated contract amount.  As a result,
    Evergrass overpaid defendant LBM Financial approximately $95,000.

144.    In or around June 2006, Evergrass ceased making interest payments due to defendants
    Mallegni and LBM Financial attempted collection of usurious and otherwise fraudulently
    inflated debts on various Depietri-affiliated projects including 219 Forest.  Thereafter,
    defendants Mallegni and LBM Financial made no further efforts to collect this loan from
    Evergrass.

**7-21 Erie Avenue Loan**

145.    In or around November 2005, Fiorillo was approached by defendant Mallegni to
    "bailout" an eight-unit townhouse condominium development, located at 7-21 Erie Avenue,

Worcester ("the Erie Avenue project"), which previously had been financed by defendant

LBM Financial and had been reacquired by defendant LBM through foreclosure.

146.    At the direction of defendant Massad, defendant Mallegni would not agree to loan money

to Fiorillo unless Depietri agreed to on the Note as well.  At that time, Depietri was

attempting to assist Fiorillo with the development of the Airline Lewis property.

147.    In or around November, 2005, Fiorillo and Depietri formed the Erie Avenue Residential

Realty Trust to acquire the Erie Avenue project from defendant LBM.

148.    On or about November 14, 2005, Fiorillo and Depietri attended the closing of the

$1,010,000 acquisition and construction loan from defendant LBM Financial to the Erie

Avenue Trust.

149.    At the loan closing, attorney Michael Norris, who represented all parties to the

transaction, informed Fiorillo, for the first time, that Fiorillo, personally, would be required

to grant a $1,010,000 second mortgage to defendant LBM Financial secured by several

properties owned by Fiorillo, including his family home on 425B Salisbury Street,

Worcester, Massachusetts.  Fiorillo refused and stated that he would not complete the

closing.  Attorney Norris left the room and walked across the hall and spoke with defendant

Mallegni. Upon his return, Norris stated to Fiorillo that unless he agreed to the deal and

allowed the second mortgage to be recorded, defendant Mallegni would have defendants

Massad and LBM Financial LBM foreclose on all other outstanding loans Fiorillo had with

them and seek to collect the deficiencies from the foreclosures against Fiorillo's family

home.  Norris further stated, "What's the difference, you either give us the mortgage now, or

we will foreclose on you later.  This way you have a shot of making a little money.  Sign the

documents or my instructions are to throw you out of this office and send you foreclosure notices on all the other loans."

150.    Fearing this retaliation from defendants Mallegni and Massad, Fiorillo agreed to the loan terms.

151.    At the urging of defendant Mallegni, Fiorillo and Depietri selected LaCourse Construction Corp. to complete the work on the Erie Avenue project.  Defendant Mallegni represented Depietri and Fiorillo that LaCourse as a reliable contractor who could complete the job in a timely and quality fashion.

152.    In or around November, 2005, LaCourse Construction began work on the Erie Avenue project.

153.    Unknown to either Depietri or Fiorillo at the time, defendant Mallegni had instructed LaCourse Construction not to pull the necessary construction permits for the project from the City of Worcester.  When Kenneth LaCourse, the owner of LaCourse Construction questioned defendant Mallegni as to why he would want to risk having the project shut down by the city, defendant Mallegni responded, "Kenny, the longer the project takes to finish, the more money Duddie [Massad] and I can make on the interest.  That's how we really make our money, default interest, late fees and points."

154.    By in or around June 2006, despite the maneuverings of defendant Mallegni, Fiorillo and Depietri had substantially completed the Erie Avenue project and had six units under purchase and sale agreements, representing approximately $1.1 million in sales.

155.    In or around October 2006, as part of a settlement with defendants LBM and Mallegni, Fiorillo was forced to give Mallegni, personally, a 25% ownership interest in the Erie

Avenue project.  As part of this agreement, defendant Mallegni was not to be paid any profits

from the project until the loan to defendant LBM Financial was paid off.

156.     Between August and November 2006, defendant Mallegni was presented four purchase

and sale agreements for sales at the Erie Avenue project.  Defendant Mallegni refused to sign

the discharges from defendant LBM Financial unless he was paid his 25% profit out of each

loan closing.  This would result in Erie Avenue being unable to make a timely repayment of

its loan from defendant LBM Financial.

157.     As a result of defendant Mallegni's refusal to sign loan discharges, Erie Avenue lost the

scheduled sale of the four units at a total purchase price of approximately $800,000.

### The 425B Salisbury Street Loan – Fiorillo Family Home

158.     In or around May 2003, Fiorillo and Krowel purchased a single family home at 425B

Salisbury Street, Worcester, Massachusetts.  In order to facilitate this purchase, Fiorillo and

Krowel received a $100,000 loan from Entrust Financial, an entity in which defendant

Massad upon information and belief was an investor and part owner.  Defendant Massad

arranged for the Entrust Financial loan.

159.     In or around May 2004, defendant Massad informed Fiorillo and Krowel that, in order to

receive additional extensions of credit from any entity with which defendant Massad was

affiliated, Fiorillo and Krowel would have to become part of the "Commerce Bank Family."

Specifically, defendant Massad instructed Fiorillo and Krowel to apply for a re-financing of

their family home through defendant Commerce Bank.  Defendant Massad further informed

Fiorillo that he wanted the Entrust Financial loan paid off.   Defendant Massad further told

Fiorillo that he did not arrange for this re-financing he would have defendants LBM

Financial and Gamewell begin foreclosure proceedings on his other properties.  In order to

33

maintain the goodwill of defendant Massad and the financial entities he controlled, Fiorillo and Krowel agreed to the refinancing.

160.    By in or around July 2004, Fiorillo and Krowel were heavily involved in several commercial real estate ventures and were seeking financing or refinancing through entities in which defendant Massad had an interest or controlled, including defendants Gamewell and LBM Financial.

161.    In or around July 2004, defendant Massad repeatedly advised Fiorillo and Krowel that they would receive formal commitments to finance these projects they had finished the re-finance of their family home defendant Commerce Bank.

162.    On or about July 26, 2004, defendant Pamela Massad called Fiorillo and Krowel and instructed them to come to the closing of the refinance of 425B Salisbury Lane at the offices of Fletcher Tilton and Whipple.   During the course of that call, defendant Pamela Massad informed Fiorillo and Krowel that they would not need their own attorney and to "get yourselves in here before my father changes his mind about all the other money you want to borrow."

163.    Once at the loan closing, defendant Pamela Massad then informed Fiorillo and Krowel, instead of the conventional loan for $547,000 with a fixed rate of 5.5% that initially had been discussed with defendant Massad, the loan instead would be a $330,700 non-conventional five year arm with a rate that could go as high as 11.5%, and a home equity line of credit for $216,300 with an interest rate that could go as high as 18%.

164.    During the course of the loan closing, defendant Pamela Massad presented Krowel with several Commerce Bank temporary checks, on which the name "Tracy Krowel" had been

hand- printed at the top.  The checks all had been dated July 30, 2004, which was the date

that the loan funds would clear.

165.    Defendant Pamela Massad informed Krowel that the checks were written from the home

equity line of credit and that she needed to sign the checks in order to close the loan.

166.     One of the checks presented to Krowel was dated July 30, 2004, which was the date the

loan proceeds would disburse, and payable to defendant Massad personally.  Defendant

Pamela Massad instructed Krowel to sign the check payable to defendant Massad and to

write in the memo section "Kevin Mc Manus loan repayment."

167.    As of July 26, 2004, neither Fiorillo nor Krowel owed defendant Massad any money in

his individual capacity and they informed defendant Pamela Massad of that fact.

168.     Fiorillo called defendant Massad to object to the payment of $35,000 to him and to

demand an explanation.  Defendant Massad told Fiorillo that if he did not tell Krowel to sign

the check he would make sure all the other promised credit would never be extended and

Fiorillo and Krowel would lose all of their deposit monies.  During the course of the call,

defendant Massad stated to Fiorillo, "Son, just get that check signed or I'm gonna have to cut

you off, we'll be through…lose my number.  You're gonna blow your money, blow your

wife's credit, and if you embarrass me and try to stick me for the $35,000, I'll foreclose on

all the other loans you got with me and my companies.  Now sign the fucking check!"

169.     Fiorillo then returned to the conference room and was then threatened by Pamela

Massad, "sign that check or we'll foreclose on your other loans, and you can forget about the

other money you want from my dad, now tell your wife to sign the check over to my father"

170.     Krowel the signed the $35,000 check payable to defendant Massad and the refinancing

loan closed.

171.    From on or about July 26, 2004 through at least in or around April 2007, defendants

Massad and Pamela Massad repeatedly have threatened to foreclose on the 425B Salisbury

Lane loan to Fiorillo or Krowel if they disclose the fact that defendant Massad was paid

$35,000 at the closing.

172.    On or about August 6, 2004, defendant Massad deposited or caused to be deposited the

$35,000 check that he obtained from Krowel into defendant Commerce Bank account

#20010975, the "David G. Massad, Special Account."

173.    On or about March 16, 2006, defendant Commerce Bank mailed Krowel a letter stating

defendant Commerce Bank was missing a signed copy of application for the home equity

loan Krowel's received on July 26, 2004, and requesting Krowel to sign an enclosed home

equity loan application form.  Inasmuch as Krowel had never wanted nor applied for such a

loan, she refused.

### The Defendants Actions Following the June 2006 Lawsuits by Fiorillo and Krowel

174.    On or about June 1, 2006, Krowel filed a civil action in Worcester Superior Court

against defendant LBM Financial, "CIV 06-1149-C", to prevent foreclosure on the 249

Lincoln Street property.

175.    On or about June 1, 2006, the Court granted Krowel a temporary restraining order

preventing defendant LBM Financial's scheduled foreclosure sale.

176.    On or about June 1, 2006, defendant Mallegni called Fiorillo and demanded that the

lawsuit against defendant LBM Financial be settled or defendant Mallegni would have

defendant Massad begin foreclosure proceedings on Fiorillo and Krowel's other properties,

including their family home.

177.   On or about June 5, 2006, defendant Gamewell Realty mailed a letter to Fiorillo
informing him that defendant Gamewell intended to foreclose on the Airline Lewis loan.

178.   On or about June 7, 2006, defendant Massad caused Commerce Bank to mail a "30 Day
Demand Notice" to Krowel which falsely stated that Krowel was in default for non-payment
and demanding the repayment of the entire unpaid principal of $326,021.19 within 30 days.

179.   On or about June 21, 2006, Fiorillo filed a civil action in Worcester Superior Court
against Gamewell Realty and Massad, "CA NO. 2006-1311-C", ("Gamewell Case") based
upon actions taken by defendants Massad, Gamewell and others in connection with the
Airline Lewis loan.

180.   On or about June 22, 2006, defendant Massad contacted Fiorillo by telephone and
instructed him to settle the Gamewell Case or he (Massad) would have Commerce Bank
foreclose on Fiorillo's personal residence.  Massad told Fiorillo, "I'm the boss and I can call
that note at any time, for any reason.  Now settle the fucking case before I fucking gotta hurt
you!"

181.   On or about July 5, 2006, an article was published in Worcester Magazine detailing
various legal battles between Fiorillo and defendant Massad.  Thereafter, other borrowers
contacted the Fiorillos and told them of their experiences with the defendants and their
fraudulent loan and collection activities.

182.   On or about July 6, 2006, defendant Massad telephonically contacted Fiorillo and told
him that if he (Fiorillo) spoke to the press or other borrowers again, defendant Massad
would have Fiorillo killed.  Specifically, defendant Massad stated to Fiorillo, "If you talk to
the press again, I will make sure it's the second to last time someone reads your name in the
paper.  The next time it will end up in the obituaries.  Dou you understand me son?  Now

37

call your attorney and deed Airline Lewis over to me or I am going to end this once and for all.  Do not fuck with me."

183.   On or about June 27, 2006, plaintiff Fiorillo caused Shrewsbury Street Development Companies to file bankruptcy case #06-41109 to receive protection from the Court's automatic stay protections to prevent defendant Gamewell from attempting to foreclose on the property based upon a fraudulently inflated and usurious debt.

184.   On or about July 17, 2006, defendant Mallegni, in an effort to pressure Fiorillo to settle his lawsuits against defendants Mallegni and Massad, directed his attorney, Roy Bourgeois, to file an attachment in the amount of $330,000, against all property in Massachusetts in which Depietri held an interest.  This attachment purportedly was filed to secure payment on the S&M Lawsuit judgment, despite the fact that, as both defendant Mallegni and his attorney Bourgeois knew, Depietri had no personal liability on the judgment and there was no ethical, legal or factually accurate basis for attorney Bourgeois to seek such an attachment.

185.   In or around July 2006, attorney Bourgeois informed at least two other individuals that the attachments were filed against Depietri in retaliation for Fiorillo's lawsuit against defendants Mallegni and LBM.

186.   In or around July 2006, defendant Mallegni told LaCourse to cease all work on projects owned by Fiorillo or Depietri.  Defendant Mallegni told LaCourse, with respect to Depietri, If Duddie [Massad] and I can squeeze Bob [Depietri] and threaten him with foreclosure, he will get Nicky [Fiorillo] to dismiss his suit."

187.   In or around July 2006, defendant Mallegni directed Kenneth LaCourse to place a mechanic's lien on the Erie Avenue property owned by Fiorillo and Depietri.  LaCourse

38

initially refused telling defendant Mallegni that he was not owed any money for that particular project.  Defendant Mallegni told him, "Kenny, if you do not lien that project, you can forget about getting being paid shit from me or Duddie [Massad]."

188.   On or about August 24, 2006, at the direction of defendant Mallegni, LaCourse placed a mechanic's lien on the Erie Avenue project in the amount of $32,226.33.  As a result of this cloud on the title, the Erie Avenue Trust lost at least one sale worth approximately $200,000.

189.   On or about August 17, 2006, defendant Gamewell, through its Attorneys Kurt Bender and Phillip Coppinger, filed a Motion for Relief From the Automatic Stay in which they stated Gamewell had a secured claim against the property totaling in excess of $944,314.00. This amount contained approximately $300,000 in fraudulently inflated and usurious interest charges.

190.   On or about September 1, 2006, defendant Mallegni made an early morning phone call to Depietri and threatened him to stop supporting Fiorillo's activities to develop 267 Shrewsbury Street or else his various loans with defendants LBM Financial and Commerce Bank would be foreclosed upon.  Specifically, Mallegni informed Depietri that unless he distanced himself from Fiorillo, Depietri would have trouble with a Commerce Bank loan on a building located at 44 Front Street, Worcester, Massachusetts, known as the Chase Building, in which Depietri and his father held an interest.  At that time, defendant Commerce Bank held a $3 million note and mortgage on the Chase Building ("the Chase loan").  Depietri was a personal guarantor on the Chase loan.

191.   On or about September 3, 2006, defendant Massad's Worcester associate made an unannounced visit to Depietri's home and informed Depietri that defendant Massad wanted Depietri to distance himself from Fiorillo and "back off" the Airline Lewis project.

192.    On or about September 6, 2006, Commerce Bank mailed Depietri a default and demand

letter demanding full and immediate repayment of the outstanding balance of over $2.6

million on the Chase loan and raising the interest rate from 7.5% to 11.5%.

193.    As a result of his receiving the default notice for the Chase loan and the visit to his home

by defendant Massad's Rhode Island associate, Depietri tried to persuade Fiorillo to settle

his differences with defendants Massad and Mallegni.

194.    On or about October 13, 2006, Fiorillo was forced to enter into a settlement agreement

with defendants Mallegni and LBM Financial regarding his June 2006 state lawsuit.

195.    On or about October 30, 2006, following the signing of the settlement agreement between

Fiorillo and defendants Mallegni and LBM Financial, a representative of Commerce Bank

notified Depietri that Commerce Bank was withdrawing its Notice of Default on the Chase

Building and reinstating his loan at the original rate of interest.

196.    On or about October 30, 2006, in connection with the Gamewell case, defendant Pamela

Massad filed an affidavit with the Court in which she stated that defendant Gamewell had

filed a Notice of Intent to charge usurious interest with the Massachusetts Attorney

General's Office in connection with the Airline Lewis loan.  As of November 20, 2006, the

Massachusetts Attorney General's Office has no such notice on file.

197.    In or around the first week of December 2006, defendant Massad telephoned Fiorillo and

Krowel and again demanded that Fiorillo immediately deed over the Airline Lewis Property

to defendant Massad, otherwise defendant Massad would cause Commerce Bank to go

forward with the foreclosure on Fiorillo's personal residence.  Defendant Massad further

threatened Fiorillo's physical safety.  Specifically, defendant Massad told Fiorillo, "If you

do not come down to the Bank this fucking minute and sign the deed over to Airline Lewis, I

will take my fucking bank and foreclose on you and your fucking family!  I'll put you, your

fucking wife and your fucking kids in a fucking shelter!  Fuck you!  You're dead kid!

You're dead!"

198.    In or around the first week of December 2006, following the call from defendant Massad

to Fiorillo and Krowel, Commerce Bank sent a Notice of Foreclosure to Fiorillo and Krowel

demanding a full payoff of the loan on their personal residence.

199.    On or about January 16, 2007, Fiorillo and SSDC filed a lawsuit against defendant

Gamewell in the United States District Court in Worcester.  Depietri filed an affidavit in

support of Fiorillo's claims, and detailing defendant Massad's attempted extortion of Fiorillo

in connection with the Airline Lewis loan.

200.    On or about January 17, 2007, Depietri met with defendant Mallegni in Mallegni's office

to discuss various outstanding loans with defendant LBM Financial, including 219 Forest

and the Evergrass loan.  During the course of this meeting, defendant Mallegni informed

Depietri that he and defendant Massad were very upset by Depietri's affidavit filed in

support of Fiorillo's lawsuit and he demanded a retraction.  Depietri refused, explaining to

defendant Mallegni that the statements were all true.  Defendant Mallegni then informed

Depietri that there was nothing more that he (Mallegni) could do with respect to Depietri's

loan and that defendant Massad had taken all of the loan files and given them to his

attorneys.

201.    On or about January 18, 2007, defendant Mallegni caused defendant LBM Financial to

make a demand on the Depietris for full an immediate payment on the $300,000 Evergrass

note.

41

202.    Between August 29, 2005 and January 18, 2007, defendants Mallegni and LBM Financial

had made no effort to call the Evergrass loan, nor did they attempt to collect monies from

Evergrass.

203.    Between January 2007 and August 2007, defendant Mallegni, directly, and through

defendant Norris offered on numerous occasions to forbear from foreclosing on the

Depietri's home if they would, among other things, drop their support of Fiorillo's lawsuits

against defendants Massad and Mallegni.  Depietri refused to drop his support of Fiorillo

and, instead, pressed defendants Mallegni and LBM Financial to return moneys they had

obtained from him fraudulently on prior loans, including 219 Forest and Lyman

Development and 230 Maple Street and Old Centre Village.

204.    In or around May 2007, defendant Mallegni caused defendant LBM Financial to institute

foreclosure proceedings against the Depietris' family home.

205.    As of June 18, 2007, defendant LBM Financial fraudulently claimed to be owed

$493,656.38 on the Evergrass Note, consisting of $300,000 in principal and $193,656.38 in

accrued interest, fees and penalties.  This constituted an effective interest rate of

approximately 47%. The Depietris refused to pay this usurious interest amount.

206.    On or about August 22, 2007, defendant LBM Financial held a foreclosure auction on the

Depietris' family home.

207.    From on or about January 16, 2007 through on or about April 26, 2007, defendant

Massad repeatedly threatened to direct Commerce Bank to hold a foreclosure auction on

Fiorillo's family home if Fiorillo did not settle the state and federal cases against defendants

Massad and Gamewell.

208.   On or about March 1, 2007, Fiorillo spoke with Kurt Binder, the attorney for defendant
Gamewell.  During the course of that discussion, it was agreed that if Fiorillo would dismiss
his state and federal lawsuits against defendants Massad and Gamewell, defendant
Commerce Bank would suspend the foreclosure action against the Fiorillo and Krowel
family home.

209.   In or around March, 2007, Fiorillo's father, Frank Fiorillo, informed defendant Massad
that he wished to purchase his son's home and requested that Commerce stay the foreclosure
proceedings.  Defendant Massad replied that he was willing to give Frank Fiorillo time to
arrange for the purchase of his son's home, on the condition that he could get Fiorillo to
settle his state and federal lawsuits against defendants Massad and Gamewell.

210.   On or about March 26, 2007, defendant Massad conducted a conference call with Frank
Fiorillo, Paul S. Lesniewski, a Senior Vice President of defendant Commerce Bank, and
Peter Favata, a mortgage broker for Frank Fiorillo.  During the course of this meeting,
defendant Massad agreed to postpone the foreclosure auction on Fiorillo's home.  At the
conclusion of this meeting, defendant Massad said to Frank Fiorillo, Frank, now get your
son to settle his case against me and this can all go away."

211.   On or about March 26, 2007, immediately following the above-described conference call,
Howard D'Amico, an attorney for defendant Commerce Bank, sent a letter to the auctioneer
informing him that the auction had been postponed until April, 11, 2007.

212.   On or about April 16, 2007, defendant Massad telephoned Frank Fiorillo and asked him
if, "Nicky [Fiorillo] had signed the releases?"  Frank Fiorillo informed defendant Massad
that he had not yet been able to get his son to settle the lawsuits.  Defendant Massad then
threatened to proceed with the foreclosure auction and told Frank Fiorillo, "If this was

twenty years ago, your son would have been in the bottom of lake Quinsigamond.  The games are over."

213.   On or about April 18, 2007, the date of the scheduled foreclosure auction, Fiorillo was called by attorney Phillip Coppinger who stated that the auction could still be halted if Fiorillo would sign settlement releases for the state and federal lawsuits.  He then faxed them to Fiorillo, who refused to sign them.

214.   In or around June 2007, Fiorillo in order to avoid further risk to his family home paid off his Commerce Bank Loan in the amount of $ 598,000.  This amount included over $19,500 in fraudulently assessed interest charges.

215.   On or about September 13, 2007, defendant LBM Financial mailed Depietri a notice of a second foreclosure sale relating to the Depietris family home on North Pond Road.

216.   The Depietri plaintiffs have paid a total of $6,342,429.00 in interest to defendants LBM Financial, Wolfpen, and Commerce Bank from 1998 through the date of filing of this Complaint, a substantial amount of which was usurious, fraudulently inflated, and obtained by extortionate means.  This sum does not include the sums converted at the various closings as aforesaid and the equitable interests unfairly assigned to defendant Mallegni.

217.   The Fiorillo plaintiffs also have suffered substantial economic and consequential damages as a result of the defendants' aforesaid actions.

## COUNT I: CIVIL RICO (18 U.S.C. § 1961)

218.   The plaintiffs repeat and reiterate each and every allegation set forth above and incorporate such allegations into this count.

219.   At all pertinent times, the defendants David G. Massad, Marcello Mellegni , Commerce Bank, Inc., Gamewell Inc. and LBM, Inc. combined to form an "enterprise" as that term is

defined at 18 U.S.C. sec. 1961.  (Hereinafter the MASSAD enterprise) Each were members

and associates of the MASSAD enterprise that was engaged in fraudulent real estate

transactions, and the procurement of fraudulent financing for such transactions through mail

fraud,  wire fraud, bank fraud, and extortion. The enterprise utilized its connection to

legitimate banking institutions to enrich its individual members. At all pertinent times the

enterprise was an organized crime group that operated in central Massachusetts and at all

pertinent times, it constituted a continuing unit for the common purpose of achieving the

enterprise objectives.

220.   At all pertinent time the enterprise was engaged in interstate commerce.

221.   The Massad enterprise is a group of individuals and corporations associated in fact

although it is not a legal entity.  The means and methods utilized to conduct its organized

crime activity included a pattern of extortion, threats, intimidation, economic duress, and

coerced refinancing which had the effect of fraudulently transforming conforming loans

into usurious ones.  The unlawful actions of the Defendants occurred on a continuing

basis from at least 1998 to the present.  The Defendants have conspired to defraud and

extract large sums of money from the Plaintiffs by engaging in the pattern of activity that

consists of numerous crimes as set froth below. .

222.   The purpose of the enterprise was as follows:

   a.      to enrich its members;

   b.      to preserve protect and augment its financial power and leverage in central

           Massachusetts.

223.   Among the means and methods employed by the members and associates of the

MASSAD enterprise in the conduct of the enterprise were the following:

45

a.     members and associates conspired committed and attempted to commit mail fraud and bank fraud through control of numerous lending institutions and companies involved in real estate transactions;

b.     members and associates engaged in extortionate acts to enrich its members.

224.   The members would cause the corporate members to write loans to the plaintiffs. When the loans were about to come due, the Defendants promised to extend these loans on the same or similar terms, lulling the Plaintiffs into a sense of false security.  When the Plaintiffs have attended the closings, the Defendants have then demanded: (1) additional and unexpected points and finance charges to make the loans; (2) increased payoff amounts, sometimes in the hundreds of thousands of dollars; and (3) that closing documents be signed immediately at said closings or that the notes will be called and the mortgages foreclosed, (4) cash payments to offset alleged debts entirely unrelated.  In addition, the defendant Michael Norris in at least one instance (the Evergrass loan) represented both the Plaintiffs and Defendants in these transactions.  Finally, in at least two separate instances, the Defendants demanded an equity interest in a project as a last-minute condition of closing.  The Defendants' apparent intent throughout the history of said loans was to profit unlawfully from said loans and/or to utilize foreclosure proceedings to take the Plaintiffs' property for less than market value.

225.   In at least one instance in or around September, 2002, some or all of the defendants extorted a debt from the Fiorello plaintiffs that was statutorily usurious in violation of G.L. c. 271 § 49 and 18 U.S.C. § 1961(A)6.  Specifically, the debt (related to the Airline Lewis building and held in the name of the Gamewell defendant) was in the amount of $575,000.00 of which $212,000.00 was "pre-paid interest" to be charged in addition to

46

interest 15%.  The funds advanced were the sum of $363,000.00; the prepaid interest of

$212,000.00 constituted approximately 59% of the sums actually advanced, well more

than twice the maximum amount of twenty per cent authorized by G.L. c 271 §49.  one or

more members of the enterprise persisted in efforts to collect the usurious debt.

Specifically, among the racketeering acts, on or about May 3, 2006, defendant Pamela

Massad mailed an acceleration and Demand letter demanding payoff sums which

constituted an effective annual rate of 47%

226.    The defendants jointly and severally have conducted the affairs of said Massad enterprise

through the aforesaid pattern of racketeering activity.  Specific racketeering acts

undertaken included but were not limited to:

**a.  Mail Fraud To Obtain $35,000.00 at the Closing of the 425 B Salisbury Loan Paid
(Pp. 33-36, <u>supra</u>)**

1.    In or around July, 2003, the one or more of the defendants devised a scheme to obtain

money by false and fraudulent pretenses representations and promises.  In the process

of doing so, they regularly utilized the United States postal service, and regularly

placed items for delivery with the United States postal service. This scheme resulted

in a wrong ful payment from the Fiorelli plaintiffs to defendant Massad of $35,000.00

at the closing of the 425B Salisbury loan.

**b.  Extortion to Obtain the sum of $35,000.000 at the Closing of the 425 B Salisbury
Loan (Pp. 33-36, <u>supra</u>)**

1.    In or around July, 2004, the one or more of the defendants did obtain property from

the Fiorelli plaintiffs with their consent, induced by wrongful use of actual or

threatened force, violence, or fear including fear of economic loss as well as of

physical harm, and by such acts obtained property to which they were not lawfully

entitled.

**c.  Bank Fraud To Obtain Property from A Financial Institution (Pp. 33-36, <u>supra</u>)**

1.  One or more of the defendants did obtain property from a lending institution by

means as of false and fraudulent pretenses, and by such acts obtained property to

which they were not lawfully entitled.

**d.  Mail fraud to Obtain payment of $63, 1893. In Closing of Old Center Realty Trust.
(Pp. 24-25, <u>supra</u>)**

1.  In or around July, 2001, the one or more of the defendants devised a scheme to obtain

money by false and fraudulent pretenses representations and promises.  In the process

of doing so, they regularly utilized the United States postal service, and regularly

placed items for delivery with the United States postal service. This scheme resulted

in a payment to defendant Massad of $63,189.30 at the closing.

**e.  Mail Fraud resulting in Usurious Interest and Lyman Development realty Trust in
amount of $48,100.28 (Pp. 25-27, <u>supra</u>)**

1.  In or around October,  2002,  one or more of the defendants devised a scheme to

obtain money by false and fraudulent pretenses representations and promises.

Specifically, they refused to provide plaintiffs with an accurate "payoff figure" for

this loan, and demanded a usurious payoff figure in violation of G.L. 271. Sec. 49. In

this process they regularly used the United states mails. This scheme resulted in a

payment to defendants of $48,100. 28 at the closing

**f.   Mail fraud in Obtaining a payoff on Mortgage at 230 Maple Street**
**(pp. 27-28, supra. )**

1.   In or around  March , 2004  one or more of the defendants devised a scheme to obtain
money by false and fraudulent pretenses representations and promises. Specifically,
they refused to provide plaintiffs with an accurate "payoff figure" for this loan, and
demanded a usurious payoff figure in violation of G.L. 271. Sec. 49.  In this process
they regularly used the United states mails.

2.   From in or around March, 2004, though March, 2005, one or more of the defendants
devised a scheme to obtain money by false and fraudulent pretenses representations
and promises. Specifically, they began billing the plaintiffs for the sum of
$50,668.72, which they falsely claimed was owed against the 230 Maple Street
Property and which sum was a usurious payoff figure in violation of G.L. c. 271 §49.
In this process they regularly used the United States mails.

**g.   Mail Fraud in Connection with the "Airline Lewis Loan" (Pp. 9-13, <u>supra</u>)**

1.   In or around September, 2002, one or more of the defendants devised a scheme to
obtain money by false and fraudulent pretenses representations and promises.
Specifically, after agreeing to finance a conventional loan through Commerce Bank,
they utilized fraudulent "bait and switch" tactics to force the plaintiffs into obtaining
higher interest financing at defendant Gamewell.  In the process doing so, they
regularly utilized the United States postal service, and regularly placed items for
delivery with the United States postal service. This scheme resulted in a excessive
interest paid to defendant Gamewell and (as an equity owners thereof) and Massad.

49

2.   In or around February, 2003, one or more of the defendants devised a scheme to obtain money by false and fraudulent pretenses representations and promises. Specifically, they refused to provide plaintiffs with an accurate "payoff figure" for this loan, and demanded a usurious payoff figure in violation of G.L. c. 271§ 49.   In this process they regularly used the United States mails.

3.   In or around September, 2004, one or more of the defendants devised a scheme to obtain money by false and fraudulent pretenses representations and promises. Specifically, they refused to provide plaintiffs with an accurate "payoff figure" for this loan, and demanded a usurious payoff figure in violation of G.L. c. 271§ 49.   In this process they regularly used the United States mails.

**h.   Attempted  Extortion in Connection with Airline Lewis (Pp. 9-13, <u>supra</u>)**

**1.       To Obtain a Deed for Airline Lewis Building.**

In or around February, 2006, one or more of the defendants did attempt to obtain property from the Fiorillo plaintiffs by wrongful use of actual or threatened force, violence, or fear including fear of economic loss as well as of physical harm, and by such acts obtained property (to wit, the deed to the Airline Lewis Property) to which they were not lawfully entitled.

**i.   Loan Sharking in Connection with Airline Lewis (Pp. 9-13, <u>supra</u>)**

1.       **To Obtain a Deed for Airline Lewis Building.**

In or around February, 2006, one or more of the defendants did violate the terms of 18 U.S.C. § 894 by attempting to obtain property from the Fiorello plaintiffs by wrongful use of actual or threatened physical force.

50

**j.  Mail Fraud in Connection with 219 Forest Street (pp. 13-21, supra.)**

1.     In or around 1999, one or more of the defendants devised a scheme to obtain money by false and fraudulent pretenses representations and promises. Specifically, they refused to provide plaintiffs with an accurate "payoff figure" for this loan, and demanded a usurious payoff figure in violation of G.L. c. 271§ 49, overcharging the plaintiff DiPietri the amount of $153,000.00.  In this process they regularly used the United States mails.

2.     In or around March, 2001 one or more of the defendants devised a scheme to obtain money by false and fraudulent pretenses representations and promises. Specifically, after agreeing to finance a conventional loan through Commerce Bank, they utilized "bait and switch" tactics to force the plaintiffs into obtaining higher interest financing at LBM.  In the process doing so, they regularly utilized the United States postal service, and regularly placed items for delivery with the United States postal service. This scheme resulted in a excessive interest paid to defendant LBM and (as equity owners thereof) Mallegni and Massad.

3.     In or around November, 2003, one or more of the defendants devised a scheme to obtain money by false and fraudulent pretenses representations and promises. Specifically, knowing plaintiffs were desirous of paying of the note, under threat of foreclosure, they again utilized fraudulent "bait and switch" tactics to force the plaintiffs into an excessive and unconscionable "payoff figure" and usurious payoff figure in violation of G.L. 271. Sec. 49, overcharging the plaintiff Depietri the amount of $1,500,000.00.  In this process they regularly used the United States mails.

51

4.      At a time unknown to plaintiffs the defendant Mallegni created a scheme to obtain money by false and fraudulent pretenses representations and promises. Specifically, he pledged the December Note to LBM as collateral with DanversBank for another deal without advising the plaintiffs. In essence he was using LBM to engage in "double dipping."   In this process they regularly used the United States mails.

**k.  Bank Fraud  in Connection with 219 Forest Street (18 U.S.C. 1344) (pp. 13-21, supra.)**

1.      In or around November, 2005, the defendant Mallegni devised a scheme to obtain money by false and fraudulent pretenses representations and promises. Specifically, he pledged the December Note to LBM as collateral for another deal without advising the plaintiffs or receiving authorization from. In essence he was "double dipping" and committing a fraud against the DanversBank to whom the note was pledged.

**l.  Extortion in Connection with 219 Forest Street (pp. 13-21, supra.)**

1.      **To Obtain a Note for $734.688.**

In or around September, 1999, one or more of the defendants did obtain property from the Depietri plaintiffs with their consent, induced by wrongful use of actual or threatened force, violence, or fear including fear of economic loss as well as of physical harm, and by such acts obtained property (to wit, the March note in the amount of $734.688.00 payable to LBM which was made up almost entirely of usurious interest) to which they were not lawfully entitled.

2. **To Obtain an Assignment of $202,271.00.**

> In or around March 2001 one or more of the defendants did obtain property from the Depietri plaintiffs with their consent, induced by wrongful use of actual or threatened force, violence, or fear including fear of economic loss as well as of physical harm, and by such acts obtained property (to wit, an assignment of their right to receive the sum of $202,271.00 to which they were not lawfully entitled.

**m. Extortion to Obtain 40% of 219 Forest Street (pp. 13-21, supra.)**

1. In or around March, 2001 one or more of the defendants did obtain property from the Depietri (to wit, a 40% interest in the 219 Forest street deal held in the name of defendant Mallegni) with their consent induced by wrongful use of actual or threatened force, violence, or fear including fear of economic loss as well as of physical harm, and by such acts obtained property to which they were not lawfully entitled.

**n. Mail Fraud in Connection with 249 Lincoln St. (Pp. 21-22, supra. )**

1. In or around May, 2005, one or more of the defendants devised a scheme to obtain money by false and fraudulent pretenses representations and promises. Specifically, after agreeing to finance a loan through LBM they utilized fraudulent "bait and switch" tactics to force the plaintiffs into assigning Mallegni 25% of the equitable interest in the deal. In the process doing so, they regularly utilized the United States postal service, and regularly placed items for delivery with the United States postal service. This scheme resulted in a excessive interest paid to defendant LBM and (as equity owners thereof) Mallegni and Massad.

**o. Extortion to Obtain 25% of 249 Lincoln Street (Pp. 21-22, supra. )**

1.      In or around May, 2005, one or more of the defendants did obtain property from the Fiorellos, (to wit, a 25% interest in the 249 Lincoln street deal held in the name of defendant Mallegni) with their consent induced by wrongful use of actual or threatened force, violence, or fear including fear of economic loss as well as of physical harm, and by such acts obtained property to which they were not lawfully entitled.

**p. Mail Fraud To Obtain 2nd Mortgage on Plaintiffs' personal residence.**
**At Evergrass Closing (Pp. 28-30, supra.)**

1.      In or around April, 2005, one or more of the defendants devised a scheme to obtain money by false and fraudulent pretenses representations and promises. Specifically, after agreeing to finance a loan to Evergrass, Inc. through LBM they utilized fraudulent "bait and switch" tactics to force the Depietri plaintiffs into providing a second mortgage secured by their personal residence to collaterize the loan. In the process doing so, they regularly utilized the United States postal service.

**q. Extortion To Obtain Obtain 2nd Mortgage on Plaintiffs' personal residence.**
**At Evergrass Closing. (Pp. 28-30, supra.)**

1.      In or around August, 2005, one or more of the defendants did obtain property from the Depietris to wit a second mortgage on their home, with their consent induced by wrongful use of actual or threatened force, violence, or fear including fear of economic loss as well as of physical harm, and by such acts obtained property to which they were not lawfully entitled.

**r. Mail Fraud To Obtain the sum of $25,798.94 at the Closing of the Evergrass Loan (Pp. 28-30, supra.)**

1.    In or around April, 2005, one or more of the defendants devised a scheme to

obtain money by false and fraudulent pretenses representations and promises.

Specifically, the defendant Mallegni converted funds in the amount of $25,344.36

at the closing of the Evergrass Loan.   In the process doing so, they regularly

utilized the United States postal service**.**

**s. Mail Fraud To Obtain the sum of $30,000.00 at the Closing of the Chase Building Loan. (Pp. 23, supra.)**

1.    In or around September, 2000 one or more of the defendants devised a scheme to

obtain money by false and fraudulent pretenses representations and promises.

Specifically, they defendant Massad converted funds in the amount of $30,000.00

at the closing of the Chase Building Loan.   In the process doing so, they regularly

utilized the United States postal service.

**t. Attempted Extortion in Connection with Prior Pending Cases**

1.    In or around 2006 and 2007 one or more of the defendants did attempt to obtain

property from the plaintiffs to wit relinquishment of choses in action including

rights to file the above captioned claims wrongful use of actual or threatened

force, violence, or fear including fear of economic loss as well as of physical

harm, and by such acts obtained property to which they were not lawfully entitled.

**u. Obstruction of Justice  in Connection with Prior Pending Cases**

1.    In or around 2006 and 2007 one or more of the defendants did attempt to obstruct

justice in violation of 18 U.S.C. §1512(b) by knowingly using intimidation,

threatening, and corruptly persuading, and attempting to intimidate, threaten,

corruptly persuade and engaging in misleading conduct towards others with the intent to influence, delay and prevent the testimony of individuals in connection with the Fiorillos various state and federal lawsuits against the defendants.

227.    On information and belief, the individual defendants each, jointly and severally have re-invested the proceeds of their racketeering in said Commerce Bank, Inc., LBM financial, and the Massad enterprise.   The defendant David G. Massad has control of said Commerce Bank.  At all relevant times the enterprise as described above had an effect upon interstate commerce.

228.    Said pattern of racketeering activity caused great damage to the plaintiffs.

229.     Moreover, it appears that such activity is persistent and on going. The intervention of the Honorable Court is necessary to deter future racketeering activity.

**COUNT II: CIVIL RICO CONSPIRACY (18 U.S.C. sec. 1964)**

230.    The plaintiffs repeat and reiterate each and every allegation set forth above and incorporate such allegations into this count.

231.    The members of the enterprises as above defined did unlawfully agree and conspire together to perform the illegal acts in violation of 18 U.S. C. Sec. 1962 as described above.

232.    Their conduct constituted an ongoing criminal conspiracy.

233.    Said RICO conspiracy caused great damage to the plaintiffs.

**COUNT III:  BREACH OF CONTRACT**
**(V. GAMEWELL; Airline Lewis Loan)**

234.    The plaintiffs repeat and reiterate each and every allegation set forth above and incorporate such allegations into this count.

56

235.    The defendant and plaintiff entered into a binding contract which contract included an implied obligation of good faith and fair dealing.

236.    By its conduct set forth above, the defendant breached said contract without excuse or right.

237.    Said breach of contract caused great damage to the plaintiff.

## COUNT IV:  BREACH OF CONTRACT
### (V. LBM: OLD CENTER REALTY TRUST)

238.    The plaintiffs repeat and reiterate each and every allegation set forth above and incorporate such allegations into this count.

239.    The defendant and plaintiff entered into a binding contract which contract included an implied obligation of good faith and fair dealing.

240.    By its conduct set forth above, the defendant breached said contract without excuse or right.

241.    Said breach of contract caused great damage to the plaintiff.

## COUNT V:  BREACH OF CONTRACT
### (V. LBM: LYMAN DEVELOPMENT REALTY TRUST)

242.    The plaintiffs repeat and reiterate each and every allegation set forth above and incorporate such allegations into this count.

243.    The defendant and plaintiff entered into a binding contract which contract included an implied obligation of good faith and fair dealing.

244.    By its conduct set forth above, the defendant breached said contract without excuse or right.

245.    Said breach of contract caused great damage to the plaintiff.

## COUNT VI:  BREACH OF CONTRACT
### (V. LBM: 230 MAPLE STREET)

246.      The plaintiffs repeat and reiterate each and every allegation set forth above and

incorporate such allegations into this count.

247.      The defendant and plaintiff entered into a binding contract which contract

included an implied obligation of good faith and fair dealing.

248.      By its conduct set forth above, the defendant breached said contract without

excuse or right.

249.      Said breach of contract caused great damage to the plaintiff.

## COUNT VII:  BREACH OF CONTRACT
### (V. WOLFPEN: 219 FOREST STREET)

250.      The plaintiffs repeat and reiterate each and every allegation set forth above and

incorporate such allegations into this count.

251.      The defendant and plaintiff entered into a binding contract which contract

included an implied obligation of good faith and fair dealing.

252.      By its conduct set forth above, the defendant breached said contract without

excuse or right.

253.      Said breach of contract caused great damage to the plaintiff.

## COUNT VIII:  BREACH OF CONTRACT
### (V. LBM: 249 LINCOLN STREET)

254.      The plaintiffs repeat and reiterate each and every allegation set forth above and

incorporate such allegations into this count.

255.      The defendant and plaintiff entered into a binding contract which contract

included an implied obligation of good faith and fair dealing.

256.     By its conduct set forth above, the defendant breached said contract without

excuse or right.

257.     Said breach of contract caused great damage to the plaintiff.

## COUNT IX:  BREACH OF CONTRACT
## (V. LBM: EVERGRASS)

258.     The plaintiffs repeat and reiterate each and every allegation set forth above and

incorporate such allegations into this count.

259.     The defendant and plaintiff entered into a binding contract which contract

included an implied obligation of good faith and fair dealing.

260.     By its conduct set forth above, the defendant breached said contract without

excuse or right.

261.     Said breach of contract caused great damage to the plaintiff.

## COUNT X:  BREACH OF CONTRACT
## (V. LBM: 7-12 ERIE)

262.     The plaintiffs repeat and reiterate each and every allegation set forth above and

incorporate such allegations into this count.

263.     The defendant and plaintiff entered into a binding contract which contract

included an implied obligation of good faith and fair dealing.

264.     By its conduct set forth above, the defendant breached said contract without

excuse or right.

265.     Said breach of contract caused great damage to the plaintiff.

## COUNT XI:  BREACH OF CONTRACT
## (V. COMMERCE: 425 SALISBURY)

266.     The plaintiffs repeat and reiterate each and every allegation set forth above and

incorporate such allegations into this count.

267.      The defendant and plaintiff entered into a binding contract which contract

included an implied obligation of good faith and fair dealing.

268.      By its conduct set forth above, the defendant breached said contract without

excuse or right.

269.      Said breach of contract caused great damage to the plaintiff.

### COUNT XII: INTENTIONAL INTERFERENCE WITH CONTRACTS
### (V. DAVID MASSAD)

270.      The plaintiffs repeat and reiterate each and every allegation set forth above and

incorporate such allegations into this count.

271.      The individual defendant David Massad controlled the corporate defendant

Commerce Bank, Inc.

272.      There was an express contract between the corporate defendant Commerce Bank,

Inc. and the plaintiff.

273.      The individual defendant David Massad of the express contract between the

corporate defendant Commerce Bank, Inc. and the plaintiff.

274.      The individual defendant David Massad interfered with the express contract

between the corporate defendant Commerce Bank, Inc. and the plaintiff, and induced and

caused the corporate defendant Commerce Bank, Inc. to breach its contract with the

plaintiff.  Said wrongful interference was without right or justification.

275.      Said tortious and wrongful interference cause the plaintiff to suffer great damage.

### COUNT XIII: INTENTIONAL INTERFERENCE WITH CONTRACTS
### (V. DAVID MASSAD/GAMEWELL)

276.      The plaintiffs repeat and reiterate each and every allegation set forth above and

incorporate such allegations into this count.

277.    The individual defendant David Massad controlled the corporate defendant

Gamewell.

278.    There was an express contract between the corporate defendant Gamewell

and the plaintiff.

279.    The individual defendant David Massad of the express contract between the

corporate defendant Gamewell and the plaintiff.

280.    The individual defendant David Massad interfered with the express contract

between the corporate defendant Gamewell and the plaintiff, and induced and caused the

corporate defendant Commerce Bank, Inc. to breach its contract with the plaintiff.  Said

wrongful interference was without right or justification.

281.    Said tortious and wrongful interference cause the plaintiff to suffer great damage.

## COUNT XIV: INTENTIONAL INTERFERENCE
## WITH CONTRACT V. MARCELLO MALLEGNI AND MICHAEL NORRIS
## (219 FOREST STREET)

282.    The plaintiffs repeat and reiterates each and every allegation set forth above and

incorporate such allegations into this count.

283.    The individual defendant Marcello Malegni exercised control over the corporate

defendant LBM.

284.    There were several express contract between the corporate defendant LBM, Inc.

and the plaintiff.

285.    The individual defendant Marcello Mallegni knew of the express contracts

between the corporate defendant LBM. and the plaintiff concerning 219 Forest Street..

286.    The individual defendant Marcello Mallegni interfered with the express contract

between the corporate defendant Commerce Bank,  Inc. and the plaintiff, and induced and caused the corporate defendant Commerce Bank, Inc. to breach its contract with the plaintiff.  Said wrongful interference was without right or justification.

287.      Said tortious and wrongful interference cause the plaintiff to suffer great damage.

## COUNT XV: INTENTIONAL INTERFERENCE WITH CONTRACTS
## (V. MARCELLO MALLEGNI: 249 LINCOLN)

288.      The plaintiffs repeat and reiterates each and every allegation set forth above and incorporate such allegations into this count.

289.      The individual defendant Marcello Mallegni controlled the corporate defendant LBM.

290.      There was an express contract between the corporate defendant LBM and the plaintiffs regarding 249 Lincoln Street.

291.      The individual defendant Marcello Mallegni knew of the express contract between the corporate defendant LBM. and the plaintiff.

292.      The individual defendant Marcello Mallegni interfered with the express contract between the corporate defendant LBM and the plaintiff, and induced and caused the corporate defendant LBM to breach its contract with the plaintiff.  Said wrongful interference was without right or justification.

293.      Said tortious and wrongful interference cause the plaintiff to suffer great damage.

## COUNT XVI: INTENTIONAL INTERFERENCE WITH CONTRACTS
## V. MARCELLO MALLEGNI: OLD CENTER REALTY TRUST

294.      The plaintiffs repeat and reiterates each and every allegation set forth above and incorporate such allegations into this count.

295.      The individual defendant Marcello Mallegni controlled the corporate defendant

LBM.

296.      There was an express contract between the corporate defendant LBM

and the plaintiff regarding Old Center Realty Trust

297.      The individual defendant Marcello Mallegni knew of the express contract

between the corporate defendant LBM. and the plaintiff.

298.      The individual defendant Marcello Mallegni interfered with the express contract

between the corporate defendant LBM and the plaintiff, and induced and caused the

corporate defendant LBM to breach its contract with the plaintiff.  Said wrongful

interference was without right or justification.

299.      Said tortious and wrongful interference cause the plaintiff to suffer great damage.

## COUNT XVII INTENTIONAL INTERFERENCE WITH CONTRACTS
## V. MARCELLO MALLEGNI: LYMAN DEVELOPMENT

300.      The plaintiffs repeat and reiterates each and every allegation set forth above and

incorporate such allegations into this count.

301.      The individual defendant Marcello Mallegni controlled the corporate defendant

LBM.

302.      There was an express contract between the corporate defendant LBM

and the plaintiff regarding Lyman Development Co.

303.      The individual defendant Marcello Mallegni knew of the express contract

between the corporate defendant LBM. and the plaintiff.

304.      The individual defendant Marcello Mallegni interfered with the express contract

between the corporate defendant LBM and the plaintiff, and induced and caused the

corporate defendant LBM to breach its contract with the plaintiff.  Said wrongful

interference was without right or justification.

305.     Said tortious and wrongful interference cause the plaintiff to suffer great damage.

### COUNT XVIII: INTENTIONAL INTERFERENCE WITH CONTRACT
### V. MARCELLO MALLEGNI: 230 MAPLE STREET

306.     The plaintiffs repeat and reiterates each and every allegation set forth above and

incorporate such allegations into this count.

307.     The individual defendant Marcello Mallegni controlled the corporate defendant

LBM.

308.     There was an express contract between the corporate defendant LBM

and the plaintiff regarding 230 Maple Street.

309.     The individual defendant Marcello Mallegni knew of the express contract

between the corporate defendant LBM. and the plaintiff.

310.     The individual defendant Marcello Mallegni interfered with the express contract

between the corporate defendant LBM and the plaintiff, and induced and caused the

corporate defendant LBM to breach its contract with the plaintiff.  Said wrongful

interference was without right or justification.

311.     Said tortious and wrongful interference cause the plaintiff to suffer great damage.

### COUNT XIX: INTENTIONAL INTERFERENCE WITH CONTRACTS
### V. MARCELLO MALLEGNI AND MICHAEL NORRIS: EVERGRASS

312.     The plaintiffs repeat and reiterates each and every allegation set forth above and

incorporate such allegations into this count.

313.     The individual defendant Marcello Mallegni controlled the corporate defendant

LBM.

314.     The individual defendant Michael Norris had substantial influence upon the corporate defendant LBM.

315.     There was an express contract between the corporate defendant LBM and the plaintiff regarding Evergrass..

316.     The individual defendants Marcello Mallegni and Michael Norris knew of the express contract between the corporate defendant LBM. and the plaintiff.

317.     The individual defendants Marcello Mallegni and Michael Norris interfered with the express contract between the corporate defendant LBM and the plaintiff, and induced and caused the corporate defendant LBM to breach its contract with the plaintiff.  Said wrongful interference was without right or justification.

318.     Said tortious and wrongful interference cause the plaintiff to suffer great damage.

**COUNT XX: MISREPRESENTATION/PROMISSORY ESTOPPEL**

319.     The plaintiffs repeat and reiterates each and every allegation set forth above and incorporate such allegations into this count.

320.     The defendants jointly and severally made material representations to plaintiffs to cause them to part with substantial sums.

321.     Plaintiff tendered substantial sums of money to the defendant.

322.     These representations were false or made with reckless disregard for the truth, or with negligent disregard for truth and with the intention of benefitting themselves ion a manner contrary to law.

323.     Plaintiff relied to his detriment upon the false and fraudulent representations made directly to him, by tendering to the defendants jointly and severally the sum of

324.     By said detrimental reliance, plaintiffs were greatly damaged.

65

## COUNT XXI UNFAIR AND DECEPTIVE PRACTICE
## UNDER G.L. C.93A SEC. 11
## ALL DEFENDANTS

325.     The plaintiffs repeat and reiterates each and every allegation set forth above and incorporate such allegations into this count.

326.     The defendants and each of them do business within the Commonwealth of Massachusetts.

327.     The manner and means described above in which all defendants attempted to collect a civil debt were unfair and deceptive as defined in G.L. c. 93A Sec. 11.

328.     As a result of the Defendants' unfair and deceptive collection practices, the Plaintiffs suffered in business and in personal and professional reputation, suffered emotional distress and were otherwise damaged

## COUNT XXII: CONVERSION

329.     The plaintiffs repeat and reiterates each and every allegation set forth above and incorporate such allegations into this count.

330.     The defendants from time to time converted funds rightfully belonging to the plaintiffs.

331.     Said illegal conversion caused the plaintiffs great damage.

## JURY DEMAND

The Plaintiffs respectfully request a trial by jury to the greatest extent allowed by law.

## PRAYER FOR RELIEF

WHEREFORE; the plaintiff respectfully requests this Honorable Court to:

1.     Issue a short order of notice, and hold a hearing following which the Court should issue a preliminary injunction enjoining said defendants from selling, transferring, alienating,

66

hypothecating, conveying, or foreclosing or otherwise obtaining any equitable interest in the Depietris' personal residence, 4 North Pond Road, Worcester, Massachusetts.

2.      Hold a hearing  following which the Court should issue an injunction enjoining said defendants from selling, transferring, alienating, hypothecating, conveying, the "Airline Lewis Building.

3.      Order the defendants jointly and severally to pay all compensatory damages in the greatest amount supported by the law or evidence.

4.      Assess against each defendant the greatest amount of special, exemplary or punitive damages as are supported by law or evidence, including but not limited to such double or treble damages assessed in accord with the terms of 18 U.S.C. 1961, et. seq, 18 U.S. C. 1964, and M.G.L. Ch. 93A.

5.      Assess against each defendant interest, costs, and attorney fees to the greatest extent permitted by law;

5.      Assess against each defendant such further relief as is mete and just.

Dated: September 25, 2007                        Respectfully submitted,

                                                PLAINTIFFS,
                                                By their attorneys,

                                                */s/ Paul J. Andrews*_____
                                                Jeffrey A. Denner, BBO #120520
                                                Robert S. Sinsheimer, BBO#464940
                                                Paul J. Andrews, BBO#558574
                                                Raipher D. Pellegrino, BBO#560614
                                                DENNER♦ PELLEGRINO, LLP
                                                Four Longfellow Place, 35th Floor
                                                Boston, MA 02114
                                                (617) 227-2800